IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 11-3599-TUC-CKJ (LAB) |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) ) | |
| Luis Miguel Raygoza-Leyva, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

The District Court referred this case to the Magistrate Judge for hearing on the defendant's motion to suppress evidence resulting from an investigative stop and subsequent questioning. (Doc. 29)  A hearing on the motion was held on May 18, 2012. (Doc. 37)

**Charge:**

The defendant is charged with re-entry after deportation in violation of Title 8, United States Code §1326 (enhanced by § 1326(b)(2)). (Doc. 6)

**Motion to Suppress:**

The defendant argues he was seized without reasonable suspicion and interrogated without being informed of his *Miranda* rights.  He moves that this court suppress all evidence obtained as a result of the Fourth and Fifth Amendment violations.

The court finds no constitutional violations. The defendant's initial encounter with the agents was consensual.  When the encounter ripened into an investigative detention, the

1  agents had reasonable suspicion.  When the investigative detention ripened into an arrest, the

2  agents had probable cause.  Until his formal arrest, the defendant was not "in custody" for

3  the purposes of *Miranda*.

4

5  **EVIDENCE:**

6  ***Matthew Robert Gardner***

7  　　　　Matthew Gardner is a U.S. Customs and Border Protection officer and has been so for

8  a little over three years.  On September 23, 2011, he was working at the Lukeville Port of

9  Entry checking the outbound flow of traffic along State Route 85.  Just north of the Port of

10  Entry on the west side of Route 85 is a café.  Just north of the café is a gas station.  East of

11  the café, across the street is a trailer park area.

12  　　　　Gardner observed a man walk from the trailer park area westward across Route 85 to

13  the gas station and then southward toward the café.

14  　　　　Gardner is familiar with the people in the area, but he did not recognize the man.  He

15  knew that illegal aliens often congregate at the café and take the shuttle bus north.  Gardner

16  informed Border Patrol Agent Espinoza of his observations.

17  　　　　On cross-examination, Gardner conceded he did not see the man cross the border.  At

18  all times, the man he observed was in the United States, north of the border.

19

20  ***Frederico Espinoza***

21  　　　　Frederico Espinoza is an agent with U.S. Border Patrol and has been so for a year and

22  a half.  Espinoza observed the suspect and followed him into the café.  Espinoza was wearing

23  the standard Border Patrol green uniform.  He was accompanied by Agent Rodriguez.

24  　　　　Espinoza approached the suspect, who was sitting at a table, and asked him his

25  citizenship.  Espinoza spoke in a conversational tone.  He did not draw his weapon.  He and

26  Agent Rodriguez did not try to surround the suspect.  He did not tell the suspect he had to

27  answer their questions.

28

1    The suspect, the defendant, stated he was a U.S. citizen and produced a California ID
2    card. Espinoza asked how he had gotten there, and the defendant said he was dropped of at
3    the gas station by a friend. Espinoza told the defendant that he saw him walk across the
4    street from the trailer park, but the defendant maintained he was dropped off at the gas
5    station. The agents asked if he would step outside to answer more questions, and the
6    defendant complied. The agents spoke in a conversational tone. They did not tell the
7    defendant that he had to come with them.

8    Espinoza asked the defendant if he knew where he was, but the defendant did not
9    answer. He was "almost stuttering, basically shaking." (Doc. 43, p. 33) The defendant then
10   said he was visiting a friend at the trailer park.

11   Officer Hoffman appeared as backup and took the defendant's California ID card to
12   the processing room, or secondary inspection room, to run a check on it.

13   Espinzoa asked the defendant if he would go to the secondary area, and the defendant
14   agreed to do so. Because the ID check was inconclusive, the agents asked the defendant if
15   they could take his fingerprints. The agents did not tell him that he had to comply or that he
16   was under arrest. The defendant was not in a locked room with agents around.

17   From the fingerprints, the agents found the defendant had been deported from the
18   Calexico Port of Entry two or three weeks earlier. The agents concluded the defendant was
19   in the country illegally and arrested him.

20   On cross-examination, Espinoza testified that the defendant did not appear nervous
21   when he was first approached in the café. He denied saying something to the effect of,
22   "You're not thinking about running, are you?" (Doc. 43, p. 42) He further denied having
23   any physical contact with the defendant in the café or seeing Agent Rodriguez grab the
24   defendant's arm.

25   Espinoza asked the defendant "if he would mind stating his citizenship." (Doc. 43,
26   p. 43) The defendant spoke English and said he was a U.S. citizen. When asked for
27   identification, the defendant produced a California ID card.

28

1           Espinoza had doubts about the defendant's citizenship because he looked out of place

2  and seemed a little stiff.  Also, his shirt was torn at the shoulder, and his pants and shoes had

3  little tears and leaves on them.  Espinoza conceded he did not state in his official report that

4  the defendant had plant material on his pants or that his shirt was ripped.

5           He conceded he did not know what he would have done if the defendant refused to

6  speak with him and got up to leave.  He maintained the defendant was free to go even when

7  he was being questioned outside.  He conceded, however, that if the defendant tried to run

8  away at that point, he would have chased the defendant down.

9           Espinoza agreed that when he asked the defendant how he got here, it is possible the

10  defendant thought he was being asked how he got to the trailer park rather than how he got

11  to the café.

12           Espinoza stated that the defendant was not read his *Miranda* rights that day.

13           On re-direct, Espinoza said he found it odd that someone at the Lukeville Port of

14  Entry would have a California ID card.

15

16  ***Adam Hoffman***

17           Adam Hoffman is a U.S. Customs and Border Protection officer and has been so for

18  approximately four and one-half years.  He currently works at the Lukeville Port of Entry.

19           At approximately 12:30 p.m. on September 23, 2011, Hoffman was alerted by radio

20  that his assistance was needed to run a citizenship check.  He walked out to the café and was

21  given the suspect's driver's license.  Using the suspect's name and date of birth, he checked

22  the ATS computer database to see if the suspect had a U.S. passport.  The suspect did not

23  have one.  He also found a record of a prior conviction and deportation.

24           Hoffman walked back to the agents and explained what he had found.  He and Agent

25  Espinoza escorted the suspect to his work station.  Hoffman testified that he did not speak

26  in a forceful tone or put the suspect in handcuffs.

27

28  ***Edward Rodriguez (affidavit)***

1  Edward Rodriguez is a U.S. Customs and Border Protection officer.

2  On September 23, 2011, Rodriguez was informed that a suspicious male was seen
3  crossing Highway 85 approximately 100 yards north of the Port of Entry and entering the
4  Gringo Pass gas station.  Rodriguez observed the man walk south into the café.  Agent
5  Espinoza began walking toward the suspect, and Rodriguez followed for officer safety.

6  Espinoza opened the door to the café and asked the suspect to come over.  He asked
7  the suspect his citizenship, and the suspect stated he was a U.S. citizen.  Espinoza asked for
8  identification and the suspect offered a California identification card.  Rodriguez asked the
9  suspect if he had a U.S. passport.  The suspect answered that he did, but he had forgotten it.
10  Espinoza asked the suspect, the defendant, to come outside of the café, and the defendant
11  complied.

12  Rodriguez asked how he had arrived at the gas station, and the defendant said he had
13  been dropped off there.  When Rodriguez told the defendant he had been seen crossing the
14  street, the defendant said he had been visiting friends in the trailer park.  Rodriguez asked
15  whom he had been visiting, but the defendant just smiled and did not reply.

16  When Hoffman arrived, Rodriguez asked him to run checks on the defendant's
17  California ID card.  The defendant handed his California ID card to Hoffman.  Rodriguez
18  told Hoffman that the defendant said he had a U.S. passport.

19  After running his checks, Hoffman returned saying he received conflicting
20  information.  Espinoza asked the defendant if he would accompany the agents to the Port of
21  Entry, and he agreed.  Rodriguez walked halfway to the secondary inspection area leaving
22  the defendant with Hoffman and Espinoza.

23

24  **DISCUSSION: Motion to Suppress**

25  The defendant argues he was seized in violation of the Fourth Amendment and
26  interrogated in violation of his rights under *Miranda*.  The court concludes the defendant's
27  constitutional rights were not violated.  The agents initial contact with the defendant in the
28  café was consensual and did not implicate the Fourth Amendment.

1   "Stops under the Fourth Amendment fall into three categories." *Morgan v. Woessner*,

2   997 F.2d 1244, 1252 (9th Cir. 1993), *cert. dismissed*, 510 U.S. 1033 (1994). "First, police

3   may stop a citizen for questioning at any time, so long as that citizen recognizes that he or

4   she is free to leave." *Id*. "Such brief, 'consensual' exchanges need not be supported by any

5   suspicion that the citizen is engaged in wrongdoing, and such stops are not considered

6   seizures." *Id*. "Examples of circumstances that might indicate a seizure, even where the

7   person did not attempt to leave, would be the threatening presence of several officers, the

8   display of a weapon by an officer, some physical touching of the person of the citizen, or the

9   use of language or tone of voice indicating that compliance with the officer's request might

10  be compelled." *U.S. v. Mendenhall*, 446 U.S. 544, 554-555, 100 S.Ct. 1870, 1877 (1980).

11      "Second, the police may 'seize' citizens for brief, investigatory stops." *Morgan,* 997

12  F.2d at 1252. This class of stops is not consensual, and such stops must be supported by

13  'reasonable suspicion.'" *Id*. Finally, police stops may be full-scale arrests. *Id*. These stops,

14  of course, are seizures, and must be supported by probable cause. *Id*.

15      Here, the agents approached the defendant in a public place, the café, and asked if he

16  would answer some questions. The defendant willingly explained that he was a U.S. citizen

17  and offered his California ID card. The agents asked if they could continue their

18  conversation outside, and the defendant complied. Agent Espinoza spoke to the defendant

19  in a conversational tone. He did not tell the defendant he had to comply with the agents'

20  requests. Espinoza was in the standard Border Patrol green uniform and he was accompanied

21  by Agent Rodriguez, but the two men did not try to surround the defendant. They were

22  armed, but their weapons were not drawn. The encounter between the agents and the

23  defendant in the café was consensual. There was no seizure. *See U.S. v. Drayton*, 536 U.S.

24  194, 200-201, 122 S.Ct. 2105, 2110 (2002) ("Even when law enforcement officers have no

25  basis for suspecting a particular individual, they may pose questions, ask for identification

26  . . . provided they do not induce cooperation by coercive means.").

27      This consensual encounter ripened into an investigatory stop by the time the

28  defendant's identification was taken away by Agent Hoffman. At this point, a reasonable

1   person would not feel free to end the encounter and walk away.  *See I.N.S. v. Delgado*, 466

2   U.S. 210, 215, 104 S.Ct. 1758, 1762 (1984) ("[A]n initially consensual encounter between

3   a police officer and a citizen can be transformed into a seizure or detention within the

4   meaning of the Fourth Amendment, if, in view of all the circumstances surrounding the

5   incident, a reasonable person would have believed that he was not free to leave.")

6   (punctuation modified); *see, e.g., U.S. v. Low*,  887 F.2d 232, 235 (9th Cir. 1989) ("The

7   retention of an airplane ticket beyond the interval required for the appropriate brief scrutiny,

8   may constitute a 'watershed point' in the seizure question.") (punctuation modified); *U.S. v.*

9   *Weaver*, 282 F.3d 302, 310 (4th Cir. 2002) ("[N]umerous courts have noted that the retention

10  of a citizen's identification or other personal property or effects is highly material under the

11  totality of the circumstances analysis."), *cert. denied*, 537 U.S. 847 (2002).  There was no

12  Fourth Amendment violation, however, because at this point the agents had reasonable

13  suspicion.

14          Reasonable suspicion exists when, based on the "totality of the circumstances," "the

15  detaining officers have a particularized and objective basis for suspecting the particular

16  person stopped of criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690,

17  695 (1981)  The court may consider, among other things, "characteristics of the area,"

18  "proximity to the border," the behavior of the suspect, and "officer experience." *U. S. v.*

19  *Tiong,* 224 F.3d 1136, 1139 (9th Cir. 2000).

20          In this case, the suspect looked out of place and had a guarded demeanor.  His

21  clothing was disheveled; bits of leaves clung to his pant legs.  He was in a place the agents

22  knew was frequented by illegal aliens.  He responded to the agents' questions but failed to

23  dispel their concerns.  When asked how he got there, the suspect responded that he was

24  dropped off at the gas station.  When told that he was seen crossing the road toward the gas

25  station, he changed his story and said he was visiting friends at the trailer park.  When asked

26  for the friends' names, he declined to answer.  As the questioning continued, the suspect had

27  difficulty answering.  He was  "almost stuttering, basically shaking."  These facts and

28  circumstances combined with the training and experience of the agents constitute reasonable

1  suspicion for the investigative detention. *See, e.g., U.S. v. Hernandez-Lopez*, 538 F.2d 284,

2  285 (9th Cir. 1976) (Passenger's demeanor, dress, general appearance, and nervous behavior

3  constituted reasonable suspicion.), *cert. denied*, 429 U.S. 981 (1976).

4  The defendant further argues the agents' questioning violated his rights under

5  *Miranda*.  The court finds the defendant was not "in custody" for the purposes of *Miranda*.

6  "In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures

7  to guarantee that a suspect is advised of his Fifth Amendment rights before custodial

8  interrogations." *U.S. v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing 384 U.S. 436,

9  444–45, 86 S.Ct. 1602 (1966)).  "An officer's obligation to administer *Miranda* warnings

10  attaches, however, only where there has been such a restriction on a person's freedom as to

11  render him 'in custody.'" *Stansbury v. California*,  511 U.S. 318, 322, 114 S.Ct. 1526, 1528

12  - 1529 (1994) (punctuation modified).  "In determining whether an individual was 'in

13  custody,' a court must examine all of the circumstances surrounding the interrogation, but

14  the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of

15  movement of the degree associated with a formal arrest." *Id*.  "Pertinent areas of inquiry

16  include the language used by the officer to summon the individual, the extent to which he or

17  she is confronted with evidence of guilt, the physical surroundings of the interrogation, the

18  duration of the detention, and the degree of pressure applied to detain the individual." *U.S.

19  v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir. 2009) (punctuation modified), *cert. denied*, 130

20  S.Ct. 1545 (2010).

21  In this case, while the defendant was subject to an investigative detention, he was not

22  "in custody" for the purposes of *Miranda*. The agents spoke in a conversational tone.  They

23  asked for his citizenship, but did not accuse him of being an illegal alien.  Although the

24  duration of the stop was not discussed specifically, it does not appear to have been lengthy.

25  Finally, and perhaps most importantly, the questioning took place in public. *See Berkemer

26  v. McCarty*, 468 U.S. 420, 438, 104 S.Ct. 3138, 3149 (1984) ("Perhaps most importantly, the

27  typical traffic stop is public, at least to some degree.").

28

Based on the totality of the circumstances, the court concludes the defendant was not in custody for the purposes of *Miranda* during the investigative detention outside the café. *See, e.g., U.S. v. Medina-Villa*, 567 F.3d 507, 520 (9th Cir. 2009) ("Even though the border patrol agent prevented Medina from leaving the parking lot by blocking his car, approaching it with his gun drawn, and interrogating him about his citizenship and immigration status. . . Medina was not in custody and was not entitled to *Miranda* warnings.").

After running his computer inquiries, Hoffman walked back to the agents and explained what he found. Contrary to the defendant's assertions, he discovered the defendant did not have a U.S. passport. Moreover, he found a record of a prior conviction and deportation. The agents then escorted the defendant to the secondary inspection room.

At some point, possibly when the defendant was escorted to the secondary inspection area, the investigative detention ripened into an arrest. *See U.S. v. Chamberlin*, 644 F.2d 1262, 1267 (9th Cir. 1980) (Terry stop ripened into an arrest when the suspect "was placed in the back seat of a police car for twenty minutes."), *cert. denied*, 453 U.S. 914 (1981); *but see U.S. v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001) ("It is true that the mere detention of a person in a border station's security office from which he or she is not free to leave, while a search of a vehicle occurs, is not 'custody' for these purposes."). The court need not decide precisely when this actually occurred because as soon as Agent Hoffman made his inquiries, the agents had probable clause to arrest the defendant.

Probable cause which exists "when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime." *U. S. v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992) (internal punctuation removed).

Here, the agents knew, in addition to all that they had discovered previously, that the suspect did not have a U.S. passport, as he claimed. They further found a record of a prior conviction and deportation associated with his name and date of birth. Based on this information, a prudent person would have concluded that there was, at least, a fair probability that the defendant had committed the crime of reentry. Accordingly, the agents had probable

1  cause to arrest the defendant at any time after Hoffman ran his computer inquiries.  The
2  defendant's eventual arrest did not violate the Fourth Amendment.

3         Finally, the court finds that the defendant was not in custody for the purposes of
4  *Miranda* when he was escorted to the secondary inspection station and asked to submit his
5  fingerprints.

6         The defendant willingly accompanied the agents to the secondary inspection area.
7  The agents did not tell the defendant that he had to do so, or that he was under arrest. *See*
8  *U.S. v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("Where we have found an
9  interrogation non-custodial, we have emphasized that the defendant agreed to accompany
10 officers to the police station or to an interrogation room.")  (punctuation modified).
11 Hoffman testified that he did not speak in a forceful tone or put the suspect in handcuffs.
12 Espinoza testified the defendant was not placed in a locked room with agents around.  On this
13 record, the court cannot find that the defendant was in custody for the purposes of *Miranda*
14 when he was escorted to the secondary inspection area.  *See, e.g.*, *U.S. v. Pitcher*, 2011 WL
15 162406, 4 (D.Idaho 2011)  (Defendant was not "in custody" for *Miranda* purposes when he
16 "agree[d] to accompany officers to an interrogation room," he was told he was suspected of
17 drug trafficking, he was interrogated in a small room with two officers but "seated next to
18 the door that was not locked or blocked in any manner," he was interrogated for 90 minutes,
19 and "the interrogation was not hostile.").  The defendant's questioning at the secondary
20 inspection area prior to his formal arrest did not violate his rights under *Miranda*.

22 **RECOMMENDATION:**

23        In view of the foregoing it is recommended that, after its independent review of the
24 record, the District Court **DENY** the motion to suppress. (Doc. 29)

25        Written objections must be served and filed by July 16, 2012. Counsel should be
26 prepared to argue those objections the morning of trial, which is currently set for July 17,
27 2012.

28

1      The Clerk of the Court is directed to send a copy of this Report and Recommendation

2   to all parties.

3      DATED this 5th day of July, 2012.

4

5

6                                Leslie A. Bowman
                                 United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28